UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-80966-CIV-MARRA

NORTH AMERICAN SPECIALTY
INSURANCE COMPANY, a New
Hampshire corporation,

Plaintiff,

vs.

AMES CORPORATION/DAWSON
BUILDING CONTRACTORS, INC., a
joint venture of Rainbow City, Alabama,

Defendants.
_____/

AMES CORPORATION/DAWSON
BUILDING CONTRACTORS, INC., a
joint venture of Rainbow City, Alabama

Defendants/Counter-Plaintiffs,

vs.

NORTH AMERICAN SPECIALITY
INSURANCE COMPANY, a New Hampshire
corporation,

Plaintiff/Counter-Defendant.
_____/

## OPINION AND ORDER

This cause is before the Court upon Plaintiff North American Speciality Insurance

Company's ("NAS") Motion for Partial Summary Judgment (DE 14) and Defendants Ames

Corporation and Dawson Building Contractors, Inc.'s ("Ames/Dawson") Request for Hearing on

Plaintiff's Motion for Partial Summary Judgment (DE 25).[1]  The Court has carefully considered the motions and is otherwise fully in the premises.

I.  Background

The issues addressed in the instant action relate to work performed for the Veterans Administration Medical Center located in West Palm Beach, Florida (the "Project").  (Marcha Durcan Aff. ¶ 3, DE 15-1.)  On or about July 6, 2006, Ames/Dawson, as general contractor, entered into a subcontract with American Roofing, LLC ("American Roofing") to furnish labor, services, materials, supervision, equipment, tools, scaffolds, transportation and storage for roofing work at the Project.   (Durcan Aff. ¶ 4; James Dawson Aff. ¶ 7.)   In connection with the subcontract,  NAS, as surety, issued two separate subcontract performance bonds (the "bonds") (identical in form) on behalf of American Roofing, as principal, with Ames/Dawson, as obligee:

> a. Bond No. 2067780 with the penal amount of $499,000 dated September 29, 2006 for "Contract No. V548-C-080A, Roofing related work on the third floor of the VAMC, West Palm Beach, Florida"; and

> b. Bond No. 2067781 with the penal amount of $310,976.00 dated September 29, 2006 for "Contract No. V548-C-080B, Roofing related work on the fifth and ninth floor, the Laundry Room, the Energy Center and other roofing areas at the VAMC, West Palm Beach, Florida."

(Durcan Aff. ¶ 5; Answer and Affirmative Defenses.)

According to NAS, the material terms of the bonds are as follows:

> Whenever Principal shall be, and be declared by Obligee to be in default under the subcontract, the Obligee having performed Obligee's obligations

---

[1] On March 5, 2010, the Court granted Plaintiff's unopposed motion to amend the Complaint to include a claim for breach of contract.  (DE 50.)  The present motion only sought summary judgment on original complaint for a declaratory judgment.  Therefore, the Court will construe this as a motion for partial summary judgment instead of a motion for summary judgment.

thereunder:

(1) Surety may promptly remedy the default . . . ;

(2) Obligee after reasonable notice to Surety may, or Surety upon demand of Obligee may arrange for the performance of Principal's obligation under the subcontract . . .;

(3) . . . If the Surety arranges completion or remedies the default, that portion of the balance of the subcontract price as may be required to complete the subcontract or remedy the default and to reimburse the Surety for its outlays shall be paid to the Surety at the times and in the manner as said sums would have been payable to Principal had there been no default under the subcontract.

According to Ames/Dawson, the following terms of the Bonds are also material:

WHEREAS, Principal has by written agreement dated July 6, 2006 entered into a subcontract with Obligee for . . . in accordance with drawings and specifications prepared by . . . which specifications is by reference made a part hereof . . ."

(3) The balance of the subcontract price, as defined below, shall be credited against the reasonable cost of completing performance of the subcontract. If completed by the Obligee, and the reasonable cost exceeds the balance of the subcontract price, the Surety will pay the Obligee such excess . . ."

(Bonds, Ex. A.2, attached to Durcan Aff.)

The Bonds incorporate the Subcontract by reference. (Answer and Affirmative Defenses ¶

9.)   Article 13 of the Subcontract provides in pertinent part:

. . . or if [Subcontractor] should otherwise be guilty of a breach of the contract, then the Contractor may without prejudice to any other right or remedy terminate the employment of the Subcontractor after giving him twenty-four (24) hours written notice of his intention to do so and may thereupon take control of the work covered by the Subcontract . . . .

(Subcontract, Ex. 1, attached to Dawson Aff.)

According to NAS, by letters dated November 29, December 14, and December 21, 2007,

Ames/Dawson complained about potential issues with American Roofing under the Subcontract.

These letters were sent to American Roofing and NAS but did not declare a default or

termination of the subcontract, nor did they make a demand upon NAS to perform under the

Bonds. (Durcan Aff. ¶ 6; November 29, December 14, December 21, 2007 letters, Ex. A.3,

attached to Durcan Aff.)

On the other hand, Ames/Dawson states that these letters declare American Roofing in

default, thereby triggering NAS' obligations under the Bonds.  (Dawson Aff. ¶¶ 10, 12, 14.)

The November 29, 2007 letter urged NAS to get involved in the project and represented that if

the project was not manned or completed immediately by American Roofing or NAS, that

Ames/Dawson would be forced to complete the work using other forces. (November 29, 2007

letter.)  The December 14, 2007 letter stated as follows:

> [American Roofing] is continuing to delay the project by refusing to provide materials to
> complete [American Roofing's] work and basically placing the management of
> [American Roofing's] subcontract in [Ames/Dawson's] hands. . . Ames/Dawson is placed
> in a position of having to order and pay for [American Roofing's] materials and pay
> another roofing company to perform the work.  We will look to you, as surety, for any
> costs we incur beyond American Roofing's subcontract amount.  You need to get
> involved immediately to see that the work is completed without further delay and
> additional costs.

(December 14, 2007 letter.)     The December 21, 2007 letter stated in pertinent part:

> This is to advise you that Ames/Dawson has been unable to get American Roofing to
> complete the remainder of its subcontract on the reference project, forcing us to assume
> the responsibility of completing the subcontract with other contractors and forces. . .
> These expenses are continuing to be incurred.  Although we have notified you in
> numerous correspondence, no one from your company has contacted us nor visited the
> jobsite, leaving us no alternative but to do whatever is necessary in order to complete the
> work that was subcontracted to American Roofing to the satisfaction of the Department
> of Veteran Affairs. Once the project is completed and all costs are assembled, we will
> submit our itemized breakdown to you for reimbursement.

(December 21, 2007 letter.)

4

As a result of these letters, NAS commenced a preliminary investigation, under a complete reservation of rights, into Ames/Dawson's complaints.  (Durcan Aff. ¶ 7.)  NAS represented that it retained a consultant to assist in the matter related to the Bonds and requested that Ames/Dawson provide certain documents for its review.  (Dawson Aff. ¶ 15.)  NAS issued its letter dated February 8, 2008, acknowledging Ames/Dawson's "potential performance bond claims" while noting that the prior letters were not accompanied "by supporting documentation and/or prior notice to the principal of default and/or potential default."  NAS closed the letter advising Ames/Dawson that its activities were being "undertaken with a full reservation of [NAS'] rights and defenses under the terms of its bonds, the contract and the law."[2]  (Durcan Aff. ¶ 7, Feb. 8, 2008 letter, Ex. A.4, attached to Durcan Aff.)  Ames/Dawson did not issue any communication to NAS refuting this statement.  (Durcan Aff. ¶ 7.)  According to Ames/Dawson, a meeting took place on February 22, 2008 between the Veterans Administration, Ames/Dawson, NAS and American Roofing.  NAS represented that it would take up to five months for NAS to step in and take action under the Bonds. (Dawson Aff. ¶ 17.)

Ames/Dawson issued a letter to American Roofing and NAS dated February 25, 2008 and copied to Ames/Dawson corporate representative, Jim Dawson, wherein Ames/Dawson confirmed that the Subcontract was not terminated. (Durcan Aff. ¶ 8.)  Specifically, the letter stated ". . . the surety is forewarned of the short time for completion with respect to arranging performance if American does not perform.  Please understand that we want very much for

---

[2] Ames/Dawson points out that this letter also stated that "[o]n December 3, 2007, the surety received its first notice of claim from the obligee dated November 15, 2007.  The surety acknowledged that claim on December 13, 2007.  Subsequently, we received five (5) notices dated, November 29, 2007, December 14, 2007, December 20, 2007, December 21, 2007 and January 24, 2008." (Feb. 8, 2008 letter, Ex. A.4, attached to Durcan Aff.)

American Roofing to timely complete the contract so that termination is not required." (February 25, letter, Ex. A.6, attached to Durcan Aff.)   The next day, Ames/Dawson issued yet another letter to NAS, copied to Ames/Dawson corporate representative, Jim Dawson, and American Roofing's counsel, Michael Kennedy, acknowledging that Ames/Dawson had not declared a default under the Subcontract. (Durcan Aff. ¶ 9.)   That letter stated "[i]n an abundance of hope we haven't declared a default." (February 26, 2008 letter, Ex. A.6, attached to Durcan Aff.) According to counsel for Ames/Dawson, at the time he wrote that February 25, 2008 letter, he mistakenly indicated that a default had not been declared.[3]   (Larry Leiby Aff. ¶ ¶ 6-7, DE 34-2.)

By its February 27, 2008 letter, NAS confirmed Ames/Dawson's failure to declare a default and advised that NAS had no obligation to act under the Bonds in the absence of a declaration of default.  The February 27, 2008 letter provided in pertinent part " . . . your acknowledgment that [Ames/Dawson] has not declared American Roofing [ ] in default, nor terminated its right to perform under the bonded subcontracts.  As such, NAS has no obligation to act under the [Bonds]." (February 27, 2008 letter, Ex. A.7, attached to Durcan Aff.)

On April 3, 2008, Ames/Dawson sent a letter to American Roofing and NAS complaining that American Roofing had not supplied the roof warranty documents, and stated the following:

> Accordingly, demand is hereby made that American Roofing provide a roof warranty acceptable to the VA and complete any necessary work so that the warranty certifications, and Product Approval/Notice of Acceptance are issued to the VA before April 17, 2009. American Roofing's failure to provide the warranty, complete the necessary work, and provide the above-referenced data and certifications . . . shall constitute a material default under the Subcontract Agreement . . .

---

[3] Mr. Dawson, the designated person for dealing with claims under the bonds for Ames/Dawson, did not provide counsel for Ames/Dawson with copies of the November and December 2007 letters. (Dawson Aff. ¶ ¶ 4-5, 18.)

(Durcan Aff. ¶ 11; April 3, 2008 letter, Ex. A.8, attached to Durcan Aff.)

NAS claims that throughout the foregoing communications, American Roofing continued to perform without interruption its obligations under the Subcontract without ever being formally declared in default or terminated.  By July 31, 2008, American Roofing had completed its contractual obligations.  At no time, did Ames/Dawson ever make a demand that NAS perform the subcontract under the Bonds. (Durcan Aff. ¶ 12.)

Despite the failure to declare a default or terminate American Roofing under the Subcontract, as early as February 2008, Ames/Dawson began to supplement and remediate American Roofing's scope of work under the subcontract, and indicated its intent to continue to do so.  (Durcan Aff. ¶ 13.)  NAS and American Roofing objected to Ames/Dawson's unilateral supplementation of the Work.  The objection was referenced in NAS' letter dated February 27, 2008.  NAS specifically informed Ames/Dawson that "any efforts undertaken by Ames/Dawson to supplement and/or perform any portion of the bonded subcontract will be construed as a material breach of the Bonds, which may render same null and void."[4] (Durcan Aff. ¶ 14; February 27, 2008 letter, Ex. A.7, attached to Durcan Aff.)

Notwithstanding NAS' warning, Ames/Dawson persisted with its unilateral supplementation.  On June 19, 2008, Ames/Dawson presented a claim to NAS for damages in the amount of $842,672.93 under the Bonds.  Ames/Dawson's claim was for, among other things, supplementing American Roofing's work force.  In its June 19, 2008 letter, Ames/Dawson notified NAS that it had exhausted all remaining contract balances and retainage by performing

---

[4] Ames/Dawson states that it disputes this fact.  However, the citation in support of the disputed fact is simply "Dawson Affidavit" without any reference to a particular paragraph of that affidavit.

the Work under the subcontract.  (Durcan Aff. ¶ 15; June 19, 2008 letter, Ex. A.9, attached to

Durcan Aff.)  NAS denied the claim. (Durcan Aff. ¶ 16.)

According to NAS, on July 31, 2008, after Ames/Dawson had begun supplemental and

remedial work on the Project, after American Roofing had completed its scope of work

and after NAS' denial of the June 2008 claim, Ames/Dawson sent a letter to American Roofing

and NAS seeking to declare American Roofing in default under the subcontract.  (Durcan Aff. ¶

17; July 31, 2008 letter, Ex. A.10, attached to Durcan Aff.)

According to Ames/Dawson, after February 25, 2008, Ames/Dawson was required to

continue to arrange for the performance of American Roofing's obligations under the

subcontract, with NAS' consent, in order to complete American Roofing's work.  (Dawson Aff. ¶

20.)  Since the end of January 2009 through about September 15, 2009, Ames/Dawson has been

notifying NAS of roof leaks and other claims of nonperformance, requesting that such leaks and

claims be remedied.  NAS had taken no action except for limited inspections of the roof leaks

and claims. (Dawson Aff. ¶ 21.)  On September 22, 2009 and September 23, 2009, the roof

manufacturer that supplied certain materials for the roofing system installed by American

Roofing on the Project inspected the roof. (Dawson Aff. ¶ 22.)  As a result of the inspection,

numerous leaks, problems and deficiencies in the roofing system installed by American Roofing

were identified.  These deficiencies were in addition to the roof leaks and other claims of

nonperformance of which NAS had previously received notice from Ames/Dawson. (Dawson

Aff. ¶ 23.)  On October 9, 2009, Ames/Dawson again requested that NAS promptly remedy

American Roofing's failure to perform its contract or arrange for the performance of the work to

repair the deficiencies in the roof system.  (Dawson Aff. ¶ 24.)  Ames/Dawson incurred and

continues to incur costs to complete and achieve full performance of the Subcontract, which costs exceed the balance of the subcontract price.  In addition, Ames/Dawson has incurred delays in completing the project as a result of American Roofing's failure to finish the roof work under the Subcontract timely. (Dawson Aff. ¶ 25.)  Ames/Dawson seeks damages against NAS  for the delay in completion of the project and costs incurred to complete and achieve full performance of the subcontract after Ames/Dawson issued what it contends were its declarations for default. (Dawson Aff. ¶ 26.)

NAS moves for partial summary judgment on the following grounds: (1) Ames/Dawson failure to satisfy a condition precedent; namely, the declaration of default of American Roofing, entitles NAS to summary judgment as a matter of law; (2) Ames/Dawson materially breached the bond by depriving NAS of its right to remedy any alleged default, thus rendering the bond null and void as a matter of law and (3) Ames/Dawson violated paragraph three of the Bonds which required that Ames/Dawson make available to NAS unpaid subcontract balances in connection with NAS remedying an alleged default.  In response, Ames/Dawson contends that  it issued an unambiguous declaration of default and provided NAS with a reasonable opportunity to remedy American Roofing's default or arrange for the performance of American Roofing's obligations under the subcontract.

## II.  Summary Judgment Standard

The Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The stringent burden of establishing the absence of a

genuine issue of material fact lies with the moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323.  To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case.  Id. at 325.

After the movant has met its burden under Rule 56(c), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  According to the plain language of  Fed. R. Civ. P. 56(e), the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings," but instead must come forward with "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587.

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim.  Anderson, 477 U.S. at 257.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party."  Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-

moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." Anderson, 477 U.S. 242, 249-50.

III.  Discussion

A.  Declaration of Default

"As a general rule, a surety's liability on a bond is determined strictly from the terms and conditions of the bond agreement." DCC Contractors, Inc. v. Randall Mech., Inc., 791 So. 2d 575, 576 (Fla. Dist. Ct. App. 2001) citing American Home Assurance Co. v. Larkin Gen. Hosp., Ltd., 593 So. 2d 195 (Fla. 1992).  "The purpose of a performance bond is to guarantee the completion of the contract upon default by the contractor."  American Home, 593 So. 2d at 198.[5]

The United States Court of Appeals for the Fifth Circuit applied Florida law in addressing similar facts present before this Court.  In L & A Contracting Co. v. Southern Concrete Svcs., Inc., 17 F.3d 106 (5th Cir. 1994), the general contractor had numerous difficulties with its bonded subcontractor and twice sent cure notices to both the subcontractor and the performance bond surety.  Nonetheless, the subcontractor completed its contract obligations.  The contractor then sought to recover delay damages from the performance bond surety.  Id. at 108.  The Fifth Circuit found the surety not liable because the contractor had never formally declared the principal in default.  Indeed, the Court noted the high standard under Florida law for constituting a declaration of default:

> A declaration of default sufficient to invoke the surety's obligations under the bond must be made in clear, direct, and unequivocal language. The declaration must inform the surety that the principal has committed a material breach or series of material breaches of

---

[5] In a diversity case, the Court applies Florida law.  See Pendergast v. Sprint Nextel Corp., 592 F.3d 1119, 1132-33; Royal Ins. Co. of America v. Whitaker Contracting Corp., 242 F.3d 1035, 1040 (11th Cir. 2001).

the subcontract, that the obligee regards the subcontract as terminated, and that the surety must immediately commence performing under the terms of its bond.

Id. at 111.

In fact, the L & A Court noted that it reviewed ten separate letters that the general contractor sent the subcontractor each of which it characterized as a declaration of default, even though only two were sent to the surety. The Court used the sheer volume of these letters to explain that "[l]etters from general contractors attempting to prod subcontractors into improved performance are inevitably abundant in large construction projects but are not generally thought to constitute declarations of default." Id. at 111 n.18. Consequently, the Court explained that "[a] declaration of default is an act of legal significance marking a fundamental change in relations among the parties to a suretyship contract. The burden is on the party initiating that fundamental change to express it plainly and unequivocally." Id. Most significant, in L & A, the Court found that the evidence was insufficient as a matter of law to establish a declaration of default. None of the letters contained the word "default" and there was no "unequivocal declaration of default in other terms of correspondence." Id. at 111.

Here, none of the letters (i.e., November 29, 2007, December 14, 2007 and December 21, 2007) upon which Ames/Dawson relies contain the word "default." Even viewing the language in the letters in the light most favorable to Ames/Dawson, these letters do not contain the "clear, direct, and unequivocal" language required to declare a default. Instead, the language in these letters urge performance and encourage the surety to become more involved in the project. In fact, even the letters issued in February and April 2008, after the letters on which Ames/Dawson is now relying in declaring a default, demonstrate that Ames/Dawson did not intend for those 2007 letters to constitute notice of a default. Those letters reveal that American Roofing was

12

expected to complete the work under the subcontract and that no default had been declared.  On February 25, 2008, Ames/Dawson wrote "we want very much for American Roofing, LLC to timely complete the contract so that termination is not required." (February 25, 2008 letter.)  That letter was immediately followed by Ames/Dawson's February 26, 2008 letter stating, "[i]n an abundance of hope we haven't declared a default.  That has been acknowledged several times now." (February 26, 2008 letter.)

    With respect to the April 3, 2008 letter sent by Ames/Dawson, the Court concludes, as a matter of law, that it threatened American Roofing and NAS with a potential default, but did not declare a default.  That letter made a demand that American Roofing provide an acceptable roof warranty and complete necessary work before April 17, 2009 and that the failure to do so "shall constitute a material default under the subcontract agreement."  The language of that letter can be compared to the language in the case of  CC-Aventura v. Weitz Co., LLC, No. 06-21598-CIV, 2008 WL 2699577 (S.D. Fla. July 8, 2008).  There, the Court analyzed the following language, "Pursuant to the terms of the Performance Bond, please consider this letter as well to be formal notice of our intent to look to [the surety] to honor its performance bond obligations *in the event that [the subcontractor] and general liability carrier fail to do so*." Id. at * 4 (emphasis added). The court found that the phrase "'in the event that [the subcontractor] and general liability carrier fail to do so' transforms this sentence from what could reasonably be read as a formal declaration of default into a conditional statement, a 'warning shot' that appears intended to induce the subcontractor into fulfilling the terms of its Subcontract, and enlisting [the surety's] help to do so." Id.  In contrast, it was not until the July 31, 2008 letter that Ames/Dawson declared default. That letter stated "[b]ased on the lack of recognition of the nonperformance of American Roofing

13

Co. the bond contract and bond are declared to be in default." (July 31, 2008 letter).

In response, Ames/Dawson points to several cases that supports a finding that the November and December 2007 letters constitute notices of default. In <u>CC-Aventura, Inc. v. Weitz Co.</u>, LLC, No. 06-21598-CIV, 2008 WL 2699506 (S. D. Fla. June 30, 2008), a surety was denied summary judgment on the issue of notice of default. That court examined the following language: "Weitz informed Great American that it was providing 'notice of the performance *defaults* of C & L under its subcontract,' and that when Weitz determined the amount of damage 'relating [sic] these *defaults*' in excess of the remaining Subcontract balance it would 'demand reimbursement for these costs as required by the terms of the Bond.'" <u>Id.</u> at * 4 (emphasis added). Ames/Dawson also points to language in <u>CC-Aventura, Inc. v. Weitz Co., LLC</u>, No.06-21598-CIV, 2008 WL 2937856 (S.D. Fla. July 14, 2008). The language at issue in that case was:

> The purpose of this letter is [sic] provide you notice of the performance *defaults* of Aero Cooling Systems, Inc. under its subcontract with Weitz regarding the . . . Project and Bond. Because of Aero's *defaults*, Weitz has hired a replacement subcontractor and is incurring expenses to cure Aero's breaches and complete their performance, and these costs are likely to exceed any amounts which would otherwise be payable to Aero under the subcontract. At such time as the total amount of costs incurred in excess of the subcontract amount is determined, Weitz will demand reimbursement for these costs as required by the terms of the . . .bond . . . Please be advised that all non-conforming conditions remain your responsibility for the duration of the bonds, in accordance with their terms . . . . Thank you in advance for your assistance in resolving these *defaults*.

<u>Id.</u> at * 3 (emphasis added). The surety's motion for summary judgment on the issue of default was denied. <u>Id.</u> at * 5. Unlike the letters relied upon by Ames/Dawson, the letters in these cases make numerous references to defaults. Thus, the Court finds these cases to be unpersuasive.[6]

---

[6] The Court also finds unpersuasive Ames/Dawson's reliance on <u>Colorado Structures, Inc. v. Insurance Co. of the West</u>, 106 P. 3d 815 (Wash. App. 2005), which applies Washington state law.

Next, Ames/Dawson states that its counsel's February 26, 2008 and April 3, 2008 letters contained unilateral mistaken indications that did not prejudice NAS (Resp. at 11.)  Specifically, Ames/Dawson states that its counsel was unaware of the prior declarations of default contained in the November and December 2007 letters.  Ames/Dawson contends that "Florida law supports the proposition that relief will be granted for a unilateral mistake where the mistake goes to the substance of the agreement, is not the result of a lack of due care, and where the other party has not relied upon the mistake to his detriment." (Resp. at 11 citing Langbein v. Comerford, 215 So. 2d 630 (Fla. Dist. Ct. App. 1968)).

NAS correctly points out that the Langbein case addresses the formation of a contract. Instead, the more appropriate analysis is whether Ames/Dawson's statements to NAS are binding on Ames/Dawson under the agency/principal relationship.  Here, there is no factual dispute that Mr. Dawson was the designated person for dealing with claims under the bond. (Dawson Aff. ¶¶ 4-5.)  After Mr. Leiby was retained by Ames/Dawson in connection with the disputes between Ames/Dawson, American Roofing and NAS, Mr. Leiby wrote NAS's counsel several letters in February and April 2008 stating that Ames/Dawson had not declared a default. (Leiby Aff.  ¶¶ 4-6.)  Although Mr. Dawson states that he did not provide Mr. Leiby with copies of the November and December 2007 letters (Dawson Aff. ¶ 18), Mr. Dawson was copied on the letters sent by Mr. Leiby in February and April 2008.  (February 26, 2008 letter; April 3, 2008 letter.)  In other words, Mr. Dawson was aware that Mr. Leiby stated in those letters that Ames/Dawson had not declared a default.  As such, it was Mr. Dawson's responsibility to correct or disavow Mr. Leiby's statements.  See Branford State Bank v. Howell Co., 88 Fla. 493, 102 So. 649, 650 (1924) ("when the principal is informed of what has been done, he must dissent, restore all the

15

fruits of the transaction, and give notice in reasonable time, or otherwise his assent to what has been done shall be presumed").[7]

B.  Breach of the Bond

NAS also moves for partial summary judgment on the grounds that Ames/Dawson failed to satisfy other conditions precedent to asserting a claim under the Bonds; namely, (1) provide NAS with sufficient time to analyze Ames/Dawson's claim and determine how it wished to proceed under the Bonds; (2) allow NAS the opportunity to remedy the alleged default and (3) make available to NAS all contract balances for the completion of work.  According to NAS, Ames/Dawson's decision to unilaterally complete the subcontract without giving NAS an opportunity to exercise its completion options discharges NAS from liability as a matter of law. In response, Ames/Dawson restates its argument that it declared a default in November and December of 2007 and not July of 2008.  Putting that argument aside, the Court finds that Florida law is squarely in favor of NAS.  See Dooley v. Mack Constructors, Inc. v. Developers Surety and Indemnity Co., 972 So. 2d 893 (Fla. Dist. Ct. App. 2008) (completion of subcontract without giving surety the opportunity to exercise its completion options breaches the bond and discharges surety's liability as a matter of law); CC-Aventura, 2208 WL 2937856, at * 7 (applying Dooley).

Ames/Dawson also claims that there are still costs recoverable against the Bond that are being discovered by the owner through the current date. Ames/Dawson asserts that it is entitled to damages that arose after the July 31, 2008 declaration of default.  NAS disagrees, contending

_____

[7] To the extent that Ames/Dawson claims that NAS must show prejudice due to Ames/Dawson's failure to declare a default, the Court disagrees. Prejudice may be presumed from a failure to give a surety notice.  See School Bd. of Escambia County, Florida v. TIG Premier Insurance Co., 110 F. Supp. 2d 1351, 1354 (N.D. Fla. 2000).  Notably, Ames/Dawson did not provide the Court with any caselaw in support of its position.

that because neither the Bond nor the subcontract allowed Ames/Dawson to exercise these remedies against NAS, the bond was rendered void.  In other words, once Ames/Dawson engaged in the supplementation of work without allowing NAS to perform, its conduct constituted a material breach that voided the bond.  Under Florida law, NAS is correct that once the bond is rendered void, the surety has no further obligation.  Id.; Insurance Co. of North America v. Metropolitan Dade County, 705 So. 2d 33, 35 (Fla. Dist. Ct. App. 1997).

IV.  Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Plaintiff's Motion for Partial Summary Judgment (DE 14) is **GRANTED**.   Defendants' Request for Hearing on Plaintiff's Motion for Partial Summary Judgment (DE 25) is **DENIED**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 17th day of March, 2010.

_____
KENNETH A.  MARRA
United States District Judge

17